**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **CASE NO. 23-cr-00428 (BAH)** |
| **DONOVAN BRAXTON,** | : | |
| | : | |
| **Defendant.** | : | |

### <u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS</u>

Defendant Braxton moves to suppress a firearm recovered from his person, arguing that law enforcement seized him when they parked more than twenty feet away from him in broad daylight. The Court should deny Braxton's motion. Law enforcement officers responded to an anonymous call that a man in a black SUV with a trailer was potentially stealing vehicles. They arrived minutes later and found Braxton next to a black SUV with a trailer. Braxton began acting suspiciously: quickly entering the vehicle and closing the door as officers approached. The officers engaged Braxton in conversation, maintaining friendly tones and never drawing their weapons. Braxton then provided a title for the trailer that did not match his ID. He stepped out of the vehicle to show officers the trailer's VIN, but when he did so, he adjusted his waistband. Braxton positioned one side of his body away from the officer and when an officer suggested he might be armed, Braxton reacted aggressively, pulling away from the officer and raising his voice. Braxton then attempted to flee, wrestling with officers before he was arrested, and a firearm found on his person. In light of their observations, law enforcement had reasonable articulable suspicion to stop Braxton. When Braxton resisted and struggled with officers, they had probable cause to arrest him and search him incident to arrest. For the following reasons, the Court should deny Braxton's motion.

## BACKGROUND

On March 29, 2023, at 4:45 PM, a man called 911 and asked for police to "respond to the rear of the address of 5026 Sheriff Road NE," Washington, D.C.  The caller reported: "It looks like there's a black SUV that's pulling a trailer.  It looks like it's getting ready to possibly steal a car in the back of that address or possibly the vehicle that's back there may be stolen.  That house . . . there's been a lot of stolen vehicles and it looks suspicious."[1] The caller reiterated the address but did not provide a call-back number.

MPD Officers Willis and Nava responded and both timely activated their body-worn cameras.[2]  When the officers arrived, arrived and noticed a black pickup truck (Oregon tag TN04463) blocking the alleyway with a trailer attached to the back, consistent with the 911 caller's description. When they first arrived, the officers observed a man later identified as Donovan Braxton, standing outside the driver's side door of the truck.  As MPD officers drew closer, Braxton sat in the driver's seat of the truck and closed the car door.

The officers approached Braxton and stated in a conversational tone: "Yeah, we got a call, does this belong to you?"  Braxton explained that he just bought the trailer and provided them a title for the trailer without any prompting from officers. Officers then asked Braxton for his name and his driver's license. Braxton's name was not on the title document he provided to officers. Braxton also indicated that the truck he was driving belonged to a friend. Officers told Braxton that they "just wanted to make sure [he was] straight," and asked, "do you mind turning off the car for a second?" Officer Willis then asked Braxton if he could show them where the VIN number

---

[1] A recording of the 911 call has been provided as Government Exhibit 1 to Chambers via USAfx.

[2] The officers' body-worn camera has been produced as Government Exhibits 2 (Willis) and 3 (Nava).

was for the trailer.  Braxton stepped out of the vehicle.  As he did so, he adjusted the area around his waistband and hoodie pocket, as pictured below:

*Figures 1 and 2: Exhibit 2*





While speaking to officers, Braxton stood with his right side towards them, keeping his front and left side away from the officers' view. Officer Willis then asked, "Do you have any

weapons on you man?" Braxton responded, "No." Officer Willis then asked, "Do you mind if I [unintelligible]?" Braxton backed away from Officer Willis and stated, "No I'm not, no, time out, hold, hold, hold, hold. How y'all just going to come back here and, no back up." At that point, Officer Willis put his left hand on the defendant's right forearm, as pictured below:

*Figure 3: Exhibit 2*



Braxton then stated in an elevated tone: "I haven't done nothing, bruh!" At that point, Officer Willis placed his other hand on Braxton's right wrist.  Braxton then pulled away from Officer Willis and took a few steps in an attempt to flee. *See* Exhibits 2 and 3 at 17:04:56-5:48-6:01. Braxton struggled with both Officers Willis and Nava while grabbing at the front of his waistband, as pictured below:

*Figure 4:  Exhibit 2*



During the struggle, one of the officers fell down and sustained cuts to his hands and knees. Officers ultimately placed Braxton in handcuffs and conducted a pat down. They felt an object consistent with a firearm, in the front of Braxton's waistband and recovered a firearm from that area, as pictured below:

*Figure 4:  Exhibit 2*



The recovered firearm was a Glock 27 with an obliterated serial number, twelve rounds of .40 caliber ammunition in the magazine, and one round of ammunition in the chamber.

## ARGUMENT

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  The Fourth Amendment requires that "all seizures, even ones involving 'only a brief detention short of traditional arrest,' be founded upon reasonable, objective justification."  *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

"Probable cause exists if a reasonable and prudent police officer would conclude from the totality of the circumstances that a crime has been or is being committed."  *United States v. Holder*, 990 F.3d 1327, 1328 (D.C. Cir. 1993).  "In assessing probable cause, as the Supreme Court has declared, "the evidence . . . collected must be seen and weighed not in terms of analysis by scholars,

but as understood by those versed in the field of law enforcement.'"  *United States v. Laws*, 808

F.2d 92, 103 (D.C. Cir. 1986) (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983) (quoting in turn

*United States v. Cortez*, 449 U.S. 411, 418 (1981))).

"[A]n officer may briefly detain a citizen if he has reasonable, articulable suspicion that

'criminal activity may be afoot.'"  *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001)

(quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  "While 'reasonable suspicion' is a less demanding

standard than probable cause and requires a showing considerably less than preponderance of the

evidence, the Fourth Amendment requires at least a minimal level of objective justification for

making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 1923 (2000).  As with probable cause, courts

look to the totality of the circumstances.  *See Edmonds*, 240 F.3d at 59 ("An officer on the beat

does not encounter discrete, hermetically sealed facts.  Rather, as we repeatedly have cautioned,

the question of whether reasonable suspicion existed can only be answered by considering the

totality of the circumstances as the officer on the scene experienced them.").  An officer may also

conduct a protective frisk for weapons if he has reasonable suspicion that the stopped individuals

are armed and dangerous.  *See Terry v. Ohio*, 392 U.S. 1 (1968); *and see Edmonds*, 240 F.3d at 59

("[A] *Terry* stop requires only a minimal level of objective justification, and an officer may initiate

one based not on certainty, but on the need to check out a reasonable suspicion.").

A seizure occurs "when physical force is used to restrain movement or when a person

submits to an officer's 'show of authority'."  *California v. Hodari D.*, 499 U.S. 621 (1991).  Unless

"a reasonable person would have believed that he was not free to leave," no seizure will have taken

place under the Fourth Amendment.  *United States v. Maragh*, 894 F.2d 415, 418 (D.C. Cir. 1990).

Courts have defined the "reasonable person test" as "not . . . what the defendant himself . . .

thought, but what a reasonable man, innocent of any crime, would have thought had he been in the

defendant's shoes." *United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007). To determine if police action amounts to a "show of authority," courts evaluate several factors including, "whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992).

## I.   BRAXTON WAS NOT SEIZED UNTIL OFFICER WILLIS PLACED HIS HAND ON HIS ARM.

Braxton argues that he was seized for Fourth Amendment purposes when the officers' vehicle "came to a stop perpendicular to [the defendant's] black SUV." ECF No. 19 at 19-20.  He is mistaken.  Braxton was not seized until Officer Willis placed his hand on Braxton's arm.  When officers stopped their vehicle, as reflected below, they were a significant distance from Braxton.

*Figure 5:  Exhibit 2*



Their lights and sirens were not activated, and the officers did not have their weapons drawn. Indeed, the officers were playing the song "We Are the Champions" by Queen in their vehicle as they began interacting with Braxton. As the officers exited the vehicle, they addressed Braxton in a friendly and non-confrontational tone. They did not run out of the vehicle shouting commands. Instead, they calmly approached Braxton who had by now had quickly entered the vehicle and closed the door. The officers' conduct did not amount to a "show of authority" sufficient enough to constitute a seizure. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *United States v. Drayton*, 536 U.S. 194 (2002) (finding that "while most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

Braxton claims that he was seized when officers parked in the alleyway because his vehicle "would have needed to execute 'a number of turns' in order to leave the scene," ECF No. 19 at 20, relying heavily on *United States v. Delaney*, 955 F.3d 1077 (D.C. Cir. 2020). There, the Circuit found that a defendant was seized because officers parked "within a few feet" of his vehicle, directed their "take-down" light on the vehicle, and did so in a dark alley at night. *Id.* at 277-278. The Circuit did not find that a seizure occurred solely because officers parked their vehicle too closely to the defendant. In fact, the Circuit took pains to differentiate prior decisions finding that defendants were not seized when officers parked closely to a defendant. Specifically, in *United States v. Johnson*, the Circuit found that no seizure occurred because officers parked "about 25 feet away from [the defendant's] car, hardly close enough to block it. 212 F.3d 1313, 1317 (D.C. Cir. 2000). And in *United States v. Goddard*, the Circuit found that a defendant was not seized when officers parked "fifteen to twenty feet away" from a defendant. 491 F.3d 457, 461 (D.C.

Cir. 2007). As reflected by officer body-worn camera, the officers were parked at a distance of at least twenty-five feet, they did not employ a spotlight or any other coercive law enforcement tool, the alley was bright and well lit, and the officers were calm and friendly in their initial interactions with Braxton.

Moreover, contrary to Braxton's claims, the officers did not even block Braxton's vehicle. As reflected in body-worn camera, the alley continued on the opposite side of Braxton's vehicle.

*Figure 6:  Exhibit 2*



Braxton could have turned right rather than left, ultimately exiting the alley onto Lee Street NE, rather than Sheriff Road NE where the officers had entered.

*Figure 7:  Google Map of Alleyway with Illustrated Vehicle and Egress Route (Green)*



Further, the reason that Braxton would have needed to make "a number of turns" to leave was not due to how the officers parked, but how Braxton parked. Braxton was parked perpendicular in the alleyway with little clearance in front of him and a cement wall. Even if the officers never responded, Braxton could not have left that alley without making several turns. His conduct in creating that situation cannot be attributed to the officers.

Braxton next contends that he was seized when he handed officers his driver's license and the title for the trailer. ECF No. 19 at 21-22. But the Circuit has made clear: "A seizure is not established by a mere request for identification, . . . nor by the initial holding and review of such documentation." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). The Supreme Court has too. *See Fla. v. Royer*, 460 U.S. 491, 501 (1983) ("Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves.") Officers casually approached Braxton with weapons holstered and engaged him in conversation as they walked towards him. They asked how he was doing and if he was pulling a tractor out. They asked if the vehicle belonged to him and explained they received "a call." Officer Willis reviewed the

documents provided and asked Braxton to turn off the vehicle.  The officers then tried to determine whether the title provided by Braxton—which was not in his name—matched the trailer and asked Braxton to point out where the VIN was on the trailer.  During the course of this conversation, officers did not accuse Braxton of anything, their weapons remained holstered, they were friendly, and they maintained a reasonable distance from Braxton.  Indeed, even when Officer Willis asked the defendant whether he had any weapons on him—the first time either officer suggested that Braxton had engaged in any wrongdoing—he maintained his conversational tone of voice and maintained some physical distance from the defendant.  *See United States v. Gross*, 784 F.3d 784, 785-86 (D.C. Cir. 2015) (holding that questions such as, [H]ey, it is the police, how are you doing? Do you have a gun?" and "Can I see your waistband?" did not constitute a stop). Therefore, until the moment that Officer Willis put his hand on Braxton's arm, Braxton was not seized.

## II. OFFICERS HAD REASONABLE ARTICULABLE SUSPICION BRAXTON WAS ENGAGED IN CRIMINAL ACTIVITY.

At the moment Officer Willis touched Braxton, the officers were aware of the following:

- At 4:44 PM, they had received a report of suspicious activity in the alley. Specifically, a black SUV was reportedly in the back of an address where there were stolen vehicles previously reported, and the black SUV was pulling a trailer;
- Two minutes later, they observed Braxton standing next to a vehicle matching that description;
- When officers entered the alley, Braxton quickly entered the front seat of the vehicle;
- Braxton claimed he had recently bought the trailer, but provided a title document in someone else's name;
- As Braxton stepped out of the vehicle, he moved to adjust his waistband;
- After pointing out the VIN, Braxton positioned himself with his body turned away from Officer Willis; and
- When Officer Willis asked if he had weapons, Braxton responded with agitation, backing away from the officer to prevent him from searching him.

These facts provide sufficient reasonable articulable suspicion justifying an investigative stop of Braxton, at the very least to investigate the possibility that Braxton had stolen the vehicle or trailer or was attempting to steal or dispose of stolen vehicles.

12

Braxton tries to undermine the reasonable articulable suspicion that existed by prying each of these observations apart and viewing them in isolation.  But this is exactly what the Supreme Court has directed our courts not to do.   In *United States v. Arvizu*, the Supreme Court reversed the Ninth Circuit's determination that an officer lacked reasonable articulable suspicion to conduct a *Terry* stop.  534 U.S. 266, 272 (2002).  The Court rejected the Ninth Circuit's "evaluation and rejection of seven of the listed factors in isolation from each other," because such an approach "does not take into account the 'totality of the circumstances,' as our cases have understood that phrase."  *Id.* at 274.   The Ninth Circuit, like counsel here, "appeared to believe that each observation by [an officer] that was by itself readily susceptible to an innocent explanation was entitled to 'no weight.'"  But, according to the Court, "*Terry* . . . precludes this sort of divide-and-conquer analysis."  *Id.*  As the Court held, "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."  *Id.* at 277.  Instead, a law enforcement officer "was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants."  *Id.* at 277.

Here, law enforcement received a tip of potential illegal activity and corroborated that tip both by observing the described vehicle and trailer and reviewing a title and ID that did not match. *See Navarette v. California*, 572 U.S. 393, 397-99, 401-02 (2014) (an anonymous tip that the tipster's car was run off the road by a drunk driver, when corroborated by certain details, had sufficient indicia of reliability for reasonable suspicion to justify an investigatory traffic stop).[3] Law enforcement continued to investigate the tip by asking Braxton to point out the VIN of the trailer.  When Braxton stepped out, as Braxton concedes, *see* ECF No. 19 at 30, he adjusted his

---

[3] Braxton argues that the anonymous tip here was not sufficiently reliable to support a seizure, citing to *Fla v. J.L.*, 529 U.S. 266 (2000).  There, however, the sole basis for a seizure was the anonymous tip.  That is not the case here.

waistband.   This provided additional suspicion that he was engaged in criminal activity, specifically that he might be armed.  *See United States v. Brown*, 334 F.3d 1161, 1165 ("It is well settled that an individual's furtive movements may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and search.")  This suspicion was further corroborated by Braxton's posture, keeping one side of his body turned away from Officer Willis despite being engaged in a friendly conversation.

Finally, when officers observed the defendant's agitated reaction to their inquiry about whether he had any weapons, that further contributed to the reasonable suspicion that he was armed and was engaged in criminal activity. As soon as Officer Willis asked whether the defendant had any weapons, the defendant became physically agitated, moving back from Officer Willis, moving his arms around, and then elevating his tone of voice. All of these actions taken in the aggregate contributed to the reasonable suspicion that the defendant was armed and involved in criminal activity. *Wardlow*, 528 U.S. at 123 ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Maynard*, 615 F.3d 544, 553 (D.C. Cir. 2010) (finding that the two defendants' inconsistent statements, purported lack of knowledge of each other, nervousness, and agitated reaction to officer questions created reasonable suspicion to believe criminal activity was afoot).

Each of these factors contributed to the officers' reasonable suspicion to believe that criminal activity was afoot and that the defendant was armed, therefore, the defendant was lawfully seized.

### III.   OFFICERS HAD PROBABLE CAUSE TO ARREST BRAXTON FOR ASSAULTING A POLICE OFFICER.

After Braxton pulled away from officers, struggled with them, and caused one officer to fall, he committed the offense of assault on a police officer, in violation of 22 D.C. Code Section

405(b).[4]   Therefore, officers had probable cause to arrest Braxton and could search his person incident to his arrest and recover the firearm. *See United States v. Jones*, 584 F.3d 1083, 1088 (D.C. Cir. 2009) ("Once appellant pushed the officer and went for his own waistband, the officer had probable cause to arrest appellant for assaulting a police officer, D.C. Code § 22–405, and to search for a gun and lawfully seize it pursuant to an arrest."); *see also Rice v. District of Columbia*, 774 F.Supp.2d 18 (D.D.C. 2011) (holding that police had probable cause to arrest the defendant for disobeying a police order and resisting and opposing a police officer after he fled when being told to "freeze").

## CONCLUSION

For all of the foregoing reasons, the Court should deny Braxton's motion to suppress.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:    */s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 981715
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530
(202) 258-3515
Cameron.tepfer@usdoj.gov

---

[4] Notably, D.C. Code expressly states: "It is neither justifiable nor excusable cause for a person to use force to resist an arrest when such an arrest is made by an individual he or she has reason to believe is a law enforcement officer, whether or not such arrest is lawful."